Filed 11/29/23  Yeng Midas Touch v. Phanichkul CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| YENG MIDAS TOUCH, INC., Plaintiff and Respondent, v. TANACHAI EDDIE PHANICHKUL et al., Defendants and Appellants. | D080981 (Super. Ct. No. 37-2019-00056185-CU-BT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed in part, and reversed and remanded in part.

Vivoli Saccuzzo and Michael W. Vivoli on behalf for Defendants and Appellants.

Stephen M. Hogan; Barry APC and Su Barry for Plaintiff and Respondent.

# I.     INTRODUCTION

Tanachai "Eddie" Phanichkul[1] appeals from two orders denying his posttrial motions for attorney fees and sanctions, after a jury ruled in his favor in an action brought against him by Yeng Midas Touch, Inc. (YMT).  In the first motion, Phanichkul sought attorney fees pursuant to Penal Code section 502, subdivision (e)(2) of the Computer Data Access and Fraud Act (CDAFA).  The trial court denied the motion on two grounds:  first, it found that the CDAFA attorney fee provision does not apply to defendants; and second, it found that defendants had not met their burden on allocation.  In the second motion, Phanichkul sought cost of proof sanctions pursuant to Code of Civil Procedure section 2033.420, based on YMT's refusal to admit several requests for admission (RFA's).  The trial court denied that motion as well, finding that YMT had either a reasonable belief that it would prevail or a good reason not to admit each RFA.  As to the motion for attorney fees, we affirm.  As to the motion for cost of proof sanctions, we reverse and remand for further proceedings.

# II.     FACTUAL AND PROCEDURAL BACKGROUND

YMT owns and operates The Holding Company, a restaurant, bar, and entertainment venue in Ocean Beach.  Phanichkul began working for YMT, as well as its then-owner, Steve Yeng, and a number of other associated restaurants owned and operated by the Yeng family, sometime around the fall of 2016, not long after YMT purchased the venue that would eventually

---

[1]    YMT sued Phanichkul and his company, M2Z PR.  At trial, Phanichkul asserted that he did not form M2Z PR until after he terminated his business relationship with YMT.  Regardless, the parties agree that M2Z PR was a sole proprietorship formed by Phanichkul and that it had no role in the litigation separate from Phanichkul himself.  Accordingly, we refer generally to Phanichkul as the defendant throughout this opinion.

become The Holding Company.  Phanichkul provided event, social media, and other web-based marketing services as an independent contractor. Phanichkul's relationship with YMT ended about a year later, around the time that YMT temporarily shut down The Holding Company venue for renovations, but, according to Phanichkul, he continued to work for another one of Yeng's ventures for some time thereafter.

## A. *YMT's Complaint Against Phanichkul*

In 2019, YMT filed a complaint against Phanichkul and his company, M2Z PR.  In the operative amended complaint (the Amended Complaint), filed in March 2020, YMT asserted six causes of action, all focused on Phanichkul's work for YMT:  (1) Interference with Prospective Economic Advantage; (2) Conversion; (3) Violations of the CDAFA; (4) Negligence; (5) Breach of Contract; and (6) Fraud.

YMT generally alleged that Phanichkul had broad access to YMT's website and accounts both during and after his employment and that he intentionally and improperly used that access to obstruct access to other key individuals at YMT after his departure.  YMT further alleged that Phanichkul changed passwords, refused to provide the information they needed to access information on their websites and accounts, and "refused to return [YMT's] Domain, email list, Social Media Email and other accounts." In addition, YMT alleged that Phanichkul "unlawfully access[ed] [YMT's] computer data and/or computer systems without authorization, including but not limited to bank accounts, ticketing accounts, and marketing email lists, both during the time of the parties' contract and after the termination of the parties' contract."

YMT alleged, more specifically, that Phanichkul did this by using his own personal contact information to set up an e-mail address

3

(1502restaurants@gmail.com) for YMT's benefit, which he then used to set up additional accounts, such as PayPal and Zenreach, and a key web domain, thcob.com. According to YMT, Phanichkul purported to hand over access to all the accounts when he terminated his relationship with YMT, but failed to disclose that he had changed the password to the underlying e-mail address, and then subsequently refused to turn over the various other associated accounts. In addition, Phanichkul registered the thcob.com domain in his own name and refused to transfer it back to YMT.

## B. *Phanichkul's Pretrial Requests for Admission*

In an attempt to narrow the scope of the case before trial, Phanichkul served YMT with 68 RFA's. The majority of the RFA's were aimed at identifying which accounts Phanichkul allegedly accessed without permission, and which accounts YMT alleged it was unable to access. YMT responded in October 2020, and denied over half of the requested RFA's, and objected to many more. Scott Yeng, Steve Yeng's brother and business partner, verified the responses for YMT.

Phanichkul also served YMT with numerous requests for production. YMT provided extensive objections but did not produce any documents until approximately one month before trial.

## C. *Evidence at Trial*

The parties listed 40 witnesses in the joint trial statement, but YMT only called three witnesses at trial: Phanichkul, as an adverse witness under Evidence Code section 776; Jake Skolnick, the individual that introduced Phanichkul to Steve Yeng and the YMT business; and Scott Yeng. Steve Yeng did not appear or testify at trial.

4

## 1. *Eddie Phanichkul*

Phanichkul testified that he created the 1502restaurants@gmail.com account to streamline his work for YMT. He told YMT it would be an important account for future web developers, marketers, and promoters. He admitted that he used his personal e-mail address and cell phone number for the password recovery, and stated that he did not recall ever changing them.

Phanichkul sent an e-mail to Steve Yeng when he first created the account. He included the password in the e-mail and stated that Steve Yeng would have full access to the account so that he could pass it on to any future marketers or website developers. Phanichkul also created a password list in a Google document that was shared with several other people at YMT. He said that he gave all of the passwords to YMT whenever he was asked and did not change the password for the 1502restaurants@gmail.com account at any point after his departure. He admitted that the password for the 1502restaurants@gmail.com account was not on the shared Google document, but said that he had tested it and was able to login to the account using the first password on the list. He did not recall anyone from YMT asking him for the password.

Regarding the thcob.com domain, Phanichkul testified that YMT had already obtained the domain when he started working for them. He asked them to transfer the domain to The Holding Company's GoDaddy account so he could begin developing the website, but they transferred it to his own personal account instead. He explained that they were scrambling to get the website up and running and it was not clear to him whether The Holding Company even had its own GoDaddy account so he just accepted the transfer and started working on the website.

Phanichkul said that he entered into an agreement with Vendini, an internet-based ticketing and content management service, and directed the

tbcob.com domain to Vendini's domain name service, or DNS.  Phanichkul made himself the administrator of the Vendini account, so that he could make changes to the website as needed, using the 1502restaurants@gmail.com domain.  However, there were multiple logins for the Vendini account, and others at YMT also had direct access.  With that access, they would have been able to make changes to the thcob.com website, even if the domain was not transferred.

Phanichkul admitted that he had accessed certain YMT bank accounts but said that he did so with Steve Yeng's permission, to develop a profit and loss statement for The Holding Company.  He said he accessed the accounts no more than five times, and each time Steve Yeng logged him in.  When confronted with his testimony from a prior deposition, Phanichkul admitted that he previously stated on at least one occasion when he accessed the bank account, " 'it was already logged in.' "  Phanichkul said that he never hacked into any website or account belonging to YMT.

Finally, Phanichkul explained that he began working for Steve Yeng in another capacity before terminating his relationship with YMT.  Steve Yeng and his wife, Brittany, were also developing another company, Skrewball Whiskey, at the time, and Phanichkul also provided website marketing services for Skrewball.  Some of the work overlapped, and Phanichkul continued to work for Skrewball, but that relationship eventually soured, and Phanichkul filed a lawsuit against Yeng and his wife claiming that he was entitled to an equitable interest in the company that owned the Skrewball brand.  Phanichkul said that YMT offered to drop the current litigation if he would agree to settle the Skrewball matter.

### 2. *Jake Skolnick*

Jake Skolnick testified that he worked for YMT as a talent buyer since about 2016.  When Phanichkul came to work with YMT, they worked

together to create content for the YMT website, and then Phanichkul would populate the website with the content. When Phanichkul left YMT in 2017, Skolnick "took over a lot of the marketing responsibilities that Phanichkul was previously doing, [and] would do the Facebook or Instagram posts." At that point, Skolnick "would just coordinate the promotion by [himself] instead of working with [Phanichkul] on it."

Skolnick said that when Phanichkul left YMT, he "turned over a spreadsheet with all account information and passwords." He also said that Phanichkul had sent him that same list of accounts and passwords multiple times while he worked at YMT. But, Skolnick testified that "not all" the accounts were included in the spreadsheet, including most notably, the 1502restaurants@gmail.com account.

Skolnick explained that YMT closed The Holding Company venue for a substantial remodel in January 2018. The remodel took longer than expected, and the venue did not reopen until July 2019. As YMT began to prepare for reopening, in June of 2019, Phanichkul let Skolnick know that the registration for the thcob.com website needed to be renewed, and asked if Skolnick wanted him to transfer the domain to him or let it expire. Skolnick requested that Phanichkul renew the domain and transfer the domain to him, and he paid Phanichkul back for the registration. Although he asked Phanichkul three times to transfer the domain, Phanichkul did not do so.[2] Because the reopening was imminent, YMT decided to just use a different domain name instead, so that they could get the website running.

---

[2] On rebuttal, Phanichkul testified that he was hesitant to transfer the thcob.com domain to Skolnick's personal account without assurances from Steve Yeng or someone else at YMT, since he was already in a legal dispute with YMT.

Skolnick further testified that on August 26, 2019, he logged into the YMT Vendini account and saw that Phanichkul was logged into the account as well. Phanichkul did not have permission to access the account at that time, as he no longer worked for YMT. Nevertheless, Phanichkul had remained as the sole administrator for the Vendini account, and Skolnick had to take steps to remove him. Skolnick also testified that when he worked at YMT, Phanichkul had accessed YMT bank accounts and expressed a concern that there may not be enough money to fund the remodel.

Skolnick testified that the e-mail address Phanichkul created for YMT, 1502restaurants@gmail.com, was used by YMT as a login for any site that required an e-mail login. When Skolnick asked another YMT employee for the password, the employee sent Skolnick a screenshot of the e-mail that Phanichkul had sent to Steve Yeng in September 2016, when he first created the account, giving Steve Yeng the password. Steve Yeng then sent Skolnick a screenshot of an attempt to login to the e-mail account, with a message indicating that the e-mail password had been changed six months prior. The password recovery information went to a phone whose last two numbers were the same as Phanichkul's phone.

Skolnick estimated that he spent about five hours helping Phanichkul put the thcob.com website together, and then spent about two hours a week promoting the website. He then spent about 20 hours recreating the content on the new website once they determined they would not be able to use the thcob.com domain. In addition, he spent about three hours changing the Vendini account to a new administrator and another five hours trying to figure out what had gone wrong with the 1502restaurants@gmail.com and thcob.com web domain accounts.

### 3. *Scott Yeng*

Scott Yeng also testified. He is Steve Yeng's brother, and the chief operating officer (COO) and president of YMT. He testified to his family's history in the restaurant business in Ocean Beach. He explained that YMT hired Matt Borza to set up the website for The Holding Company. Borza purchased the domain, thcob.com, for YMT. YMT hired Phanichkul in 2016 to assist with the building out of the thcob.com website and to promote the website and domain. The website was used for ticketing sales. Upon reopening after the remodel, he learned that the website had not been updated. He made the decision to create a new website for The Holding Company because YMT did not have access to thcob.com.

Scott Yeng also testified that he was unsuccessful in accessing the 1502restaurants@gmail.com e-mail account. He testified further that in 2016 and 2017, only three people had access to YMT bank accounts: his two brothers, Steve and Kyle; and himself. He said that he had issues with Phanichkul while he worked for YMT and that Phanichkul lacked "boundaries."

Scott Yeng testified that his brother, Steve Yeng, had negotiated the contract with Phanichkul and that Steve Yeng was the person who "was primarily involved and interacting with Phanichkul." Despite that testimony, Steve Yeng did not appear at the trial and did not testify.

## D. *The Verdict*

While discussing the jury instructions on the last day of trial, YMT voluntarily dismissed its claims for interference with prospective economic advantage and for fraud. Thereafter, the jury was presented with a special verdict form that asked them to answer questions regarding the following four causes of action: CDAFA, conversion, negligence, and breach of contract.

9

The questions included under the first two causes of action reference the web domain thcob.com, the 1502restaurants@gmail.com account, a Chase Bank account, and the Vendini account.

The jury found that YMT had not met its burden on any of the asserted causes of action and, as a result, the court entered judgment in favor of Phanichkul and against YMT.

### E. *Phanichkul's Posttrial Motions Under Penal Code Section 502, Subdivision (e)(2) and Code of Civil Procedure Section 2033.420*

After the jury rejected YMT's claims in their entirety, Phanichkul filed two posttrial motions for: (1) attorney fees under Penal Code section 502, subdivision (e)(2); and (2) cost of proof sanctions under Code of Civil Procedure section 2033.240. After hearing argument, the trial court denied both motions.

In the first of his two posttrial motions, Phanichkul sought recovery of the attorney's fees he incurred in his successful defense of YMT's charges, relying on Penal Code section 502, subdivision (e)(2), a provision of the CDAFA[3] which provides that the court "may award reasonable attorney's fees" in an action brought under CDAFA.

In denying the motion, the trial court first stated that it "agrees with the conclusion" of the court in *Physician's Surrogacy, Inc. v. German* (S.D.Cal. 2018) 311 F. Supp.3d 1190, 1195, that "[d]efendants are not entitled to recover attorney's fees" under section 502, subdivision (e)(2). Second, the

---

[3] Penal Code section 502, subdivisions (c)(2) and (e)(1) provide in pertinent part that the owner of a computer or computer system who suffers damages because a person knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief.

10

court further held that "even if an award of fees were permissible [under CDAFA]", "[d]efendant[] [has] not satisfied [its] burden" to allocate the fees, to show which fees were incurred in connection with the CDAFA cause of action and which fees were incurred in defense of the other causes of action in the complaint. The court noted that it did "not agree that the [CDAFA] claims are so intertwined [with the other causes of action] that allocation is not possible." Accordingly, the court held that "the Motion is also denied on this [alternate] basis."

In his second motion, Phanichkul requested cost of proof sanctions pursuant to Code of Civil Procedure section 2033.420, based on the numerous RFA's that YMT either denied or refused to answer. Although both the attorney fees and sanctions motions were argued together, and addressed in the tentative, the trial court initially neglected to mention the sanctions motion in its final ruling. After Phanichkul sought clarification, the trial court issued a short order confirming its tentative ruling denying the Code of Civil Procedure section 2033.420 motion as well.

In the subsequently confirmed tentative order, the trial court found that Phanichkul had met his burden to prove the truth of the disputed facts at trial, but that YMT had shown it either "had a 'reasonable ground to believe that (it) would prevail' on the matters at trial or had 'good reason for the failure to admit' the matters before trial." The trial court explained further that although YMT "did not appear to be credible" at trial, the trial court "strongly subscribes to the philosophy of allowing the parties wide latitude to try their cases," and that this case was not so "extreme" as to warrant cost of proof sanctions.

Phanichkul appeals from both rulings.

11

### III. DISCUSSION

**A. *Phanichkul Has Not Met His Burden to Establish the Trial Court Erred by Denying His CDAFA Motion for Fees***

In appealing the denial of his motion for fees under CDAFA, Phanichkul challenges the court's first basis for denying his motion for fees, contending that the plain language of the statute does not limit its reach to prevailing plaintiffs, and that the legislative history supports his view. He further argues that the court could award his fees because the YMT litigation was frivolous and abusive.

However, nowhere in his opening brief does Phanichkul contend that the trial court erred as to its second, alternate basis for denying the motion: that even if an award of attorney's fees under CDAFA were permissible, Phanichkul failed to satisfy his burden of allocating fees between the CDAFA and other causes of action. Indeed, as YMT pointed out, Phanichkul's attorney did not provide any invoices or time sheets, or otherwise attempt to allocate his time between the various causes of action asserted in the Amended Complaint. He simply averred, in a conclusory fashion, that *all* of the time that he spent working on the case was necessary to defend the CDAFA claim.

Regardless, on appeal, Phanichkul does not allege that the trial court erred in reaching that alternative determination, nor does he provide any argument or legal support for such a proposition. In fact, Phanichkul only mentions the issue in passing in his reply brief, noting, once again without any supporting legal authority, that if further allocation is required, this court should order "fair and appropriate" fees. As discussed below, by failing to assert and brief any error as to the trial court's alternate basis for denying his motion, Phanichkul is deemed to have waived any challenge on appeal to the trial court's alternate basis for the denial of his motion.

12

We start with the presumption of correctness, that is, that the trial court's ruling is presumed to be correct.  (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609.)  It is appellant's burden to present argument and legal authority for our consideration and review.  Likewise, "the scope of our review is limited to those issues that have been adequately raised and supported in the appellant's brief." (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 (*Lee*).)  We cannot, on our own and without appellant doing so himself, "furnish a legal argument as to how the trial court's rulings in this regard constituted an abuse of discretion."  (*In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1164; see also *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368.)  If an appellant fails to provide a legal argument and authorities in support of a point on appeal, the appellate court must decline to consider it. (*In re Marriage of Schroeder*, *supra*, at p. 1164.)

Here, Phanichkul's failure to allege error or to present any argument or legal authority as to why the trial court might have erred in its alternate basis constitutes a waiver of any appeal on this issue.  "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784–785; accord *Lee, supra*, 41 Cal.App.5th at p. 721.)  We must do so here.

Moreover, because the trial court ruled in the alternative in denying Phanichkul's motion for fees under 502, subdivision (e)(2), our resolution of the asserted error as to the trial court's first basis—its interpretation of the statute—will not affect the outcome on appeal.  As noted by the trial court, "even if an award of attorney fees was permissible" under CDAFA, the "[m]otion is also denied" on the alternate basis.  Accordingly, we decline to reach the merits of Phanichkul's challenge on appeal to the trial court's first

basis for the denial of his motion, because, regardless of our view on the challenged first ruling, the motion was denied in the unchallenged alternate ruling. (See *Kaiser Foundation Health Plan, Inc. v. Superior Court* (2012) 203 Cal.App.4th 696, 715–716 ["We decline to review an issue that will have no effect on the parties."].)

## B. *The Trial Court Erred By Denying Phanichkul's Motion for Cost of Proof Sanctions*

Phanichkul also asserts that the trial court erred by denying his second postjudgment motion, in which he sought cost of proof sanctions pursuant to Code of Civil Procedure section 2033.420 based on YMT's refusal to admit to certain RFA's.[4] We review the denial of a motion for cost of proof sanctions for abuse of discretion. (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1275–1276.)

Code of Civil Procedure section 2033.420 provides in relevant part as follows:

> "(a) If a party fails to admit the genuineness of any document or the truth of any matter when requested to do so under this chapter, and if the party requesting that admission thereafter proves the genuineness of that document or the truth of that matter, the party requesting the admission may move the court for an order requiring the party to whom the request was directed to pay the reasonable expenses incurred in making that proof, including reasonable attorney's fees.
>
> "(b) The court shall make this order unless it finds any of the following:

---

[4] YMT asserts that Phanichkul waived this issue both by failing to explain why the trial court's finding that YMT acted reasonably was not supported by substantial evidence and by presenting only the evidence favorable to him. We are not persuaded by either argument.

"(1) An objection to the request was sustained or a response to it was waived under Section 2033.290.

"(2) The admission sought was of no substantial importance.

"(3) The party failing to make the admission had reasonable ground to believe that that party would prevail on the matter.

"(4) There was other good reason for the failure to admit."

Here, the trial court found that Phanichkul "has carried his initial burden that he proved at trial the truth of facts which, in discovery, [YMT] had refused to admit." YMT does not dispute that finding on appeal. Taking that finding, and concession, into account, Code of Civil Procedure section 2033.420, subdivision (b) therefore required the trial court to impose sanctions unless YMT established one of the enumerated exceptions set forth therein. YMT, as the "party seeking to benefit from an exception listed in [Code of Civil Procedure] section 2033.420, subdivision (b) ' "[bore] the burden to establish the exception." ' " (*Spahn v. Richards* (2021) 72 Cal.App.5th 208, 216 (*Spahn*); *Samsky v. State Farm Mut. Auto. Ins. Co.* (2019) 37 Cal.App.5th 517, 523 [party seeking to avoid sanctions has the burden of establishing one or more of the exceptions in Code of Civil Procedure section 2033.420, subdivision (b)].)

The trial court found that YMT had met two of the enumerated exceptions. It stated that YMT "has shown that it had a 'reasonable ground to believe that (it) would prevail' on the matters at trial or had 'good reason for the failure to admit' the matters before trial." But, the trial court went on to explain: "The Court agrees that, based on its observations at trial, one or more of the matters testified to by [YMT] did not appear to be credible; however, the Court strongly subscribes to the philosophy of allowing the

15

parties wide latitude to try their cases. Though this philosophy can, at times, test the propriety of the parties' obligations in discovery, the Court is reluctant, except in extreme cases, to retrospectively question the parties' decisions with the verdict in hand. This case does not fall into the category of one of the extreme cases."

The law does not permit the trial court, or the parties, such leeway. " 'In evaluating whether a "good reason" exists for denying a request to admit, "a court may properly consider whether at the time the denial was made the party making the denial held a reasonably entertained good faith belief that the party would prevail on the issue at trial." ' " (*Spahn, supra,* 72 Cal.App.5th 208, 216.) It is not enough for the party to simply contest the issue, no matter how strenuously they do so. Rather, a " 'party's reasonable belief must be grounded in the evidence;' " and " ' "there must be some reasonable basis for contesting the issue in question before sanctions can be avoided." ' " (*Id.* at p. 217.)

Considering the totality of the record before us, including the credibility issues noted by the trial court, we conclude that the trial court abused its discretion in denying the cost of proof sanctions based on its finding that YMT had a reasonable belief it would prevail on certain issues at trial or otherwise had good reason to deny at least certain of the RFA's. (See *Shapell Socal Rental Properties, LLC v. Chico's FAS, Inc.* (2022) 84 Cal.App.5th 166, 181 ["the abuse of discretion standard measures whether, in light of the evidence, the lower court's decision falls within the permissible range of options set by the legal criteria"].)

## 1. *Issues Asserted by YMT Prior to the Trial*

We start with the allegations in YMT's Amended Complaint, which framed the action against Phanichkul. Fairly read, the Amended Complaint consists primarily of generalized allegations regarding Phanichkul's

16

purported misconduct with respect to various unnamed accounts, banks and e-mail addresses. The only items specifically named in the Amended Complaint were the thcob.com domain; the 1502restaurants@gmail.com e-mail address; and the Paypal and Zenreach accounts associated with that address. But, in its more general allegations, the Amended Complaint also alleged that Phanichkul was liable for misconduct far beyond these few specifically identified accounts.

No doubt in an effort to focus the issues at trial, Phanichkul served YMT with 68 RFA's. (See *Grace v. Mansourian* (2015) 240 Cal.App.4th 523, 528 (*Mansourian*) [explaining that RFA's " ' "are primarily aimed at setting at rest a triable issue so that it will not have to be tried' " '].) The vast majority of the RFA's were aimed primarily at identifying which accounts Phanichkul allegedly accessed without permission, and which accounts YMT alleged it was unable to access. Beyond the specifically identified accounts, the RFA's also asked for admissions as to other specific accounts, including the OB Noodle House website, MailChimp, Go Daddy, Facebook, Yelp, and AppleID accounts. YMT denied the majority of those requests and objected to and then refused to answer many more. YMT admitted approximately 16 of the 68 RFA's and provided qualified admissions that were, effectively, denials or refusals to answer as to five more.[5]

Among its other responses, YMT refused to admit that in October 2017 it was able to use the information that Phanichkul had provided to access the OB Noodlehouse website (RFA No. 29), the OB Noodlehouse webmail (RFA

---

[5]    Phanichkul refers, at times, to slightly different ranges of RFA's on appeal than in his briefing before the trial court. We focus our analysis on those RFA's referenced both in the original motion in the trial court and on appeal. Accordingly, we decline to address RFA Nos. 33, 45, 50–54, And 58.

17

No. 31); and the YMT Paypal, Zenreach, GoDaddy or Facebook accounts (RFA Nos. 32, 34, 35, 36). Similarly, YMT refused to admit that from January to October 2017 and from October 2017 through October 2019 it could access the OB Noodlehouse website (RFA Nos. 30, 56); or that from November 2017 through December 2018, it could access the OB Noodle House Website, or its Paypal, Mailchimp, Zenreach and GoDaddy accounts (RFA Nos. 43, 44, 46, 47, 48, 49); or that from January to October 2019, it could access the OB Noodle House website, or its Paypal and MailChimp accounts (RFA Nos. 56, 57, 59, 60). We will refer to the RFAs in this paragraph as the "Specified-Accounts RFAs."

Despite denying each of the Specified-Accounts RFAs, YMT continued to assert broad and generalized charges against Phanichkul up until the start of the trial. As YMT's trial brief asserted:

> "When [Phanichkul] ended his work relationship with [YMT] in or about September 2017, he was under a legal obligation to return all of [YMT's] intellectual property and computer data that were in his possession and/or control, including access to all of [YMT's] accounts, which included an email account that was used for [YMT's] accounts, including its PayPal, MailChimp, Yelp, and websites, and the main domain page for THC (thcob.com). [Phanichkul] alleges that he has returned all of [YMT's] intellectual property and computer data, however, the evidence will show that he has not."

Just days before trial, the parties estimated a six-day trial with up to forty potential witnesses.

Yet when trial commenced, YMT's case shrank dramatically. YMT presented testimony from Phanichkul and only two other relatively brief witnesses. It offered no evidence at all as to several of the accounts identified in the Amended Complaint and/or the Specified-Accounts RFAs that it denied, including PayPal, MailChimp, Yelp, Zenreach, and GoDaddy

18

accounts, and made only fleeting references to the OB Noodle House website. Skolnick testified only as to the issues with the thcob.com domain, the Gmail address, and the associated Vendini account. Scott Yeng testified as to problems updating The Holding Company website upon reopening the restaurant, but despite verifying YMT's responses to the RFA's, he had no personal knowledge of the circumstances underlying the problems or of any of the specific accounts referenced in the Specified-Accounts RFAs.

### 2. *The Specified-Accounts RFAs Sought Admissions of Substantial Importance; The Trial Court Did Not Find Otherwise*

YMT argues that the matters presented in the RFAs underlying the cost of proof motion were not of substantial importance. As an initial matter, the trial court did not make such a finding, and there is no reason to believe the trial court's ruling was based on the "no substantial importance" exception set forth in Code of Civil Procedure Section 2033.420, subdivision (b)(2). Regardless, even if we were to consider this exception, we would conclude that there would have been no reasonable basis for the trial court to conclude that the exception applies.

"An RFA has 'substantial importance' if it is 'central to disposition of the case.' " (*Doe v. Los Angeles County Dept. of Children & Family Services* (2019) 37 Cal.App.5th 675, 690; *Wimberly v. Derby Cycle Corp.* (1997) 56 Cal.App.4th 618, 634–635 ["An issue is of 'substantial importance' if it has 'at least some direct relationship to one of the central issues in the case, i.e., an issue which, if not proven, would have altered the results in the case.' "].)

YMT contends its denials of the Specified-Accounts RFAs were not of substantial importance because "[t]he issues in this case focused on Yeng's inability to access its Gmail account and the thcob.com domain (not website)." This assertion must have come as a surprise to Phanichkul—although YMT

19

chose to limit the evidence it introduced at trial to the single e-mail and domain, until midway through trial, Phanichkul had no way to know that YMT had decided to dramatically curtail its case against him and focus only on the single domain and the single e-mail account. Responding to the general allegations in YMT's Amended Complaint and the denial of the Specified Accounts RFAs, Phanichkul had to prepare to defend himself as to allegations of misfeasance as to all conceivable accounts that YMT might choose to raise at trial.

The issues in the Specified-Accounts RFAs were substantial enough to have been within the scope of the Amended Complaint, and within the issues raised in YMT's trial brief. We decline to speculate as to why YMT refused to concede the irrelevance of the various accounts named in the Specified-Accounts RFAs; but it cannot have claimed that Phanichkul was liable for damages relating to unnamed accounts and now assert that information about such accounts was not of substantial importance.

### 3. *YMT Did Not Establish a Reasonable Basis or Other Good Reason to Deny the RFA's*

YMT also asserts that it had reasonable grounds to deny the requests. At least as to the Specified-Accounts RFAs, we find no evidence, or argument, in the record to support such a conclusion.

As noted above, in assessing where there were reasonable grounds to believe it could prevail on the issue, the question is not whether the responding party "had some minimum quantum of evidence to support its denial," but whether "the litigant had a reasonable, good faith belief he or she would *prevail* on the issue at trial." (*Orange County Water Dist. v. The Arnold Engineering Co.* (2018) 31 Cal.App.5th 96, 119.) "Consideration of this question requires not only an assessment of the substantiality of the evidence for and against the issue known or available to the party, but also

20

the credibility of that evidence, the likelihood that it would be admissible at trial and persuasive to the trier of fact, the relationship of the issue to other issues anticipated to be part of trial (including the issue's importance), the party's efforts to investigate the issue and obtain further evidence, and the overall state of discovery at the time of the denials and thereafter." (*Ibid*.)

A party should admit an RFA if it can do so and "does not in good faith intent to contest the issue at trial." (*Burke v. Superior Court* (1969) 71 Cal.2d 276, 282.) "The question is not whether defendant reasonably believed he did not run the red light but whether he reasonably believed he would prevail on that issue at trial." (*Mansourian, supra*, 240 Cal.App.4th at p. 530).

Here, the trial court concluded that YMT met its burden as to its reasonable belief or other good cause. Yet as to the Specified-Accounts RFAs, there is nothing in the record to suggest that YMT had any reason to believe that it could prevail on such issues. It presented no evidence to the jury as to any of these accounts, essentially ceding the issue entirely. YMT did not assert, let alone explain why, its denials were reasonable as to these specific RFA's in the trial court and it does not even make such an argument on appeal. Thus, it is impossible to say that YMT could have had a reasonable belief that it would prevail at trial on these matters, since its own witnesses offered no evidence at all as to them.

Similarly, the record is devoid of any evidence establishing any other good reason for their denial of the Specified-Accounts RFAs, and YMT did not seriously argue this alternative exception in the trial court or on appeal. (See *Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 510–511 ["if a party in such circumstance stands on the initial denial and then fails to contest the issue at trial, a court would be well justified in finding that there

had been no good reasons for the denial, thus mandating the imposition of sanctions"].)

Thus, because there was essentially no credible evidence or argument to support the trial court's finding that YMT had a reasonable belief that it could prevail on these specific issues, or that other good reason existed for its denial of the Specified-Account RFAs, we conclude that the trial court abused its discretion in denying the motion in its entirety. As to the remaining RFA's, it appears there was at least some evidence presented, or some valid dispute as to them, and we therefore defer to the trial court's discretion.

In a final attempt to avoid this outcome, YMT asserts that Phanichkul has not established prejudice as a result of the trial court's ruling because the amount he requested was not reasonable. However, unlike the trial court's ruling on the first motion, requesting attorney fees under Penal Code section 502, in which the trial court expressly relied on the alternate ground of failure to allocate to deny the motion, the trial court did not make any findings, alternate or otherwise, regarding the reasonableness of the fees requested in the motion for cost of proof sanctions. YMT presented this as an alternative argument in the trial court, but it appears the trial court did not reach it in the first instance. Phanichkul was not required to rebut a finding that the trial court did not make on appeal, and YMT presents no authority to the contrary. Accordingly, we remand the matter to the trial court for further consideration of the motion for cost of proof sanctions pursuant to Code of Civil Procedure section 2033.420 consistent with the opinions expressed herein.

## IV.   DISPOSITION

The order denying Phanichkul's motion for fees pursuant to section 502, subdivision (e) is affirmed.  The order denying Phanichkul's request for cost of proof sanctions pursuant to Code of Civil Procedure section 2033.420 is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.  The parties are to bear their own costs on appeal.

KELETY, J.

WE CONCUR:


O'ROURKE, Acting P. J.


CASTILLO, J.